

**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>BOTEILHO HAWAII ENTERPRISES,<br>INC.,<br><br>     Debtor. | BAP No. HI-23-1186-BSG<br><br>Bk. No. 1:22-bk-00827 |
| DUTCH HAWAIIAN DAIRY FARMS,<br>LLC; MAUNA KEA MOO, LLC; KEES<br>KEA,<br>     Appellants,<br>v.<br>BOTEILHO HAWAII ENTERPRISES,<br>INC.,<br>     Appellee. | **MEMORANDUM***  |

Appeal from the United States Bankruptcy Court
for the District of Hawaii
Robert J. Faris, Chief Bankruptcy Judge, Presiding

Before: BRAND, SPRAKER, and GAN, Bankruptcy Judges.

## INTRODUCTION

Appellants Dutch Hawaiian Dairy Farms, LLC ("Dutch"), Mauna Kea

Moo, LLC ("MKM"), and Kees Kea (collectively, the "Kea Creditors") appeal an

---

\* This disposition is not appropriate for publication. Although it may be cited for
whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential
value, *see* 9th Cir. BAP Rule 8024-1.

order confirming the debtor's Subchapter V[1] plan of reorganization. Precisely, the Kea Creditors challenge the bankruptcy court's finding that the plan was in the best interest of creditors under § 1129(a)(7)(A)(ii). While the court did make some errors in reaching its decision, the Kea Creditors have failed to show how those errors, if reversed, would change the result. Ultimately, nonpriority general unsecured creditors stood to receive nothing in a chapter 7 liquidation. We AFFIRM.

## FACTS

### A.    Background of the parties

Dutch and MKM are Hawaiian limited liability companies owned by the Kea family, who have been dairy farmers in Hawaii for generations. Boteilho Hawaiian Enterprises, Inc. ("Debtor") is a Hawaii corporation which, until shortly before filing for bankruptcy, was owned by the Boteilho family since the 1960s.

Debtor owns and operates two agricultural businesses on the Big Island in Hawaii – a commercial dairy known as Cloverleaf Dairy, and a beef cattle ranch. Debtor's dairy operations are located on 880 acres leased from the Hawaii Department of Agriculture ("Dairy Lease"). The Dairy Lease allows only a dairy use for the land and expires in 2041. Debtor's beef cattle ranching operations are located on 5,500 acres leased from the Hawaii Department of

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

Land and Natural Resources ("Ranch Lease"). The Ranch Lease allows only a pasture use for the land and expires in 2031.

Nearly all of Hawaii's dairies have closed. Several factors have contributed to this, including lower prices being paid for Hawaii-produced milk, the rising cost of supplemental feed, and a persistent drought beginning in 2019 that severely affected the grass pasturage and milk output by dairy cows. By late 2019, Cloverleaf Dairy was the last remaining dairy in Hawaii.

Edward Boteilho, Jr. testified that Debtor began experiencing financial difficulties by 2014, but he had been trying to sell the business since 2010. In 2017, Debtor entered into a contract to sell Cloverleaf Dairy for $2 million. But that deal fell through. By early 2019, Mr. Boteilho had received inquiries from parties indicating an interest in buying Cloverleaf Dairy, but those offers were around $1 million. Mr. Boteilho testified that no one ever made an offer for the beef cattle ranch, even though he had tried selling it at different times.

In January 2020, Debtor and Mr. Kea (on behalf of Dutch) entered into a contract to sell Cloverleaf Dairy to Dutch for $700,000. The sale included the assignment of the Dairy Lease, all dairy cows, barns, milking equipment, refrigeration, trucks, tractors, and seven single-family homes located on the land which housed dairy employees. The sale was contingent upon Mr. Kea obtaining a loan from the State as well as State approval for assignment of the Dairy Lease. Although the parties originally agreed to a sale date of March 31, 2020, the closing date was ultimately pushed out to July 24, 2021.

Mr. Kea secured the financing for Dutch's purchase of Cloverleaf Dairy,

3

but a lawsuit filed against Debtor in 2019 by a feed supplier, among other things, contributed to the deal falling apart. The feed supplier lawsuit resulted in a $463,926.80 judgment against Debtor.

For the Cloverleaf Dairy sale to Dutch, the parties obtained a "market value appraisal" for the Dairy Lease from Ted Yamamura, who valued it at $1.15 million as of March 30, 2020. Mr. Yamamura's appraisal included only the leasehold interest of the real property; it did not include the dairy herd or equipment.

In April 2020, while the sale to Dutch was pending, the parties agreed that MKM would pasture 100 of Debtor's non-milking heifers. Debtor's pastures had been overgrazed, and Debtor had suffered significant livestock losses due to drought and malnutrition. Debtor was responsible for the care and watering of the heifers on MKM's land. For the following 16 months, MKM cared for the heifers allegedly without payment from Debtor. The Kea Creditors contend that Debtor abandoned the 100 heifers.

Two months before Debtor's bankruptcy filing in 2022, Bahman Sadeghi purchased 85.7% of Debtor's stock for $600,000, and just weeks before the filing, he loaned Debtor $200,000 for operational costs. In 2020, Mr. Sadeghi had acquired Meadow Gold, the last milk processor in Hawaii. He also purchased the $463,926.80 judgment against Debtor from the feed supplier.

## B. Postpetition events

Debtor filed a Subchapter V bankruptcy case on November 21, 2022. Mr. Kea filed two unsecured proof of claims – one on behalf of Dutch for

$3,798,810.85 for breach of contract for the failed Cloverleaf Dairy sale, and one on behalf of MKM for $601,000 for care of Debtor's 100 non-milking heifers. For the first six months of the case, Debtor continued to operate at a loss, losing approximately $437,000 despite Mr. Sadeghi's cash infusions and a $52,000 grant received from the USDA.

### 1.    Debtor's plan and Kea Creditors' objection

Debtor filed its proposed Subchapter V plan of reorganization ("Plan"). Debtor's assets were encumbered by prepetition liens held by two secured creditors, including a company owned by Mr. Sadeghi. Mr. Sadeghi's company also held a postpetition junior lien on all of Debtor's assets and a super-priority position for funding a $500,000 debtor-in-possession ("DIP") loan (which later became $1 million). Under the proposed Plan, nonpriority general unsecured creditors received nothing.

In its hypothetical chapter 7 liquidation analysis, Debtor estimated that the amount available for nonpriority general unsecured claims was negative – the "low" being -$413,991.72, and the "high" being -$261,218.79. For a cattle liquidation, Debtor estimated that the slaughterhouse value of its 1,850 head was between $555,000 and $601,250. However, estimated sale costs were between $450,000 and $600,000, because it would take three to five months for the trustee to sell the cattle on the Big Island due to limited slaughterhouse availability and cost the estate up to $150,000 per month for their care until sold. Debtor asserted that shipping cattle to the mainland or even Oahu was prohibitively expensive. Debtor also estimated a 20% capital gains tax on any

cattle sale because its tax basis in the animals was zero. As for the Dairy Lease and Ranch Lease, Debtor contended that they had no liquidation value due to their strict use restrictions. However, for purposes of the liquidation analysis, Debtor estimated their value between $250,000 and $500,000 combined.

The Kea Creditors filed a limited objection to the Plan, arguing that Debtor had substantially understated the liquidation value of its estate by over $1 million and the Plan failed to comply with § 1129(a)(7)(A)(ii). The Kea Creditors primarily took issue with Debtor's valuation of the Dairy Lease and Ranch Lease, arguing that its numbers were unsupported. According to Mr. Yamamura's appraisal from 2020, the Dairy Lease alone had a market value of $1.15 million, and Mr. Kea was informed that some of his neighbors would pay $1 million or more to acquire Debtor's interest in the Ranch Lease.[2]

In support of their limited objection, the Kea Creditors offered a declaration from Mr. Genske, a CPA with extensive dairy farming and dairy accounting experience. He opined that Debtor's estate had a liquidation value of at least $2,318,890 (including the Dairy Lease for $1.15 million), with at least $961,211 available for nonpriority general unsecured creditors. Mr. Genske disputed Debtor's cattle liquidation value. He opined that the cattle were worth $1.35 million, minus Debtor's figure of $600,000 for sale costs. Mr. Genske's $1.35 million figure was based on a plan of shipping the 1,850 head to a mainland auction house, with each of the 750 dairy cows weighing at least

---

[2] The Kea Creditors' expert, Gary Genske, testified that he would pay $1 million to acquire the Ranch Lease. Mr. Boteilho testified that there were three other buyers interested in purchasing the Ranch Lease, but he could not confirm that they would pay $1 million.

1,000 lbs. (not 500 lbs. as Debtor contended) and each of the 1,100 beef cows weighing an average of 545 lbs., and that all cows would sell for the current market price of $1.00/lb. Mr. Genske's liquidation valuation for the estate did not include the Ranch Lease, which he believed had a "feed" value of at least $1 million. Therefore, according to Mr. Genske, $1,961,211 could be available for nonpriority general unsecured creditors if the Ranch Lease was included.

Debtor argued that Mr. Genske's liquidation value of the cattle was inflated and failed to account for the dairy herd's poor-to-fair condition due to their inferior genetics from inbreeding and malnourishment, which made them unmarketable and worth only $.25-$.30/lb., and transportation costs of $.54/lb. to fly them to the West coast. Debtor further argued that Mr. Genske's reliance on the 2020 market value appraisal for the Dairy Lease was misplaced. First, that appraisal was done for loan purposes, not a liquidation which assumes the asset must be sold quickly. Second, that appraisal failed to consider that the Dairy Lease permitted only a dairy use for the land, not the wide spectrum of agricultural uses suggested.[3] Third, that appraisal erroneously suggested that the homes on the land could be rented. Finally, finding a buyer for the Dairy Lease was unlikely since its only use was for a dairy, and Cloverleaf Dairy was the last one in Hawaii. Further, the existing equipment was old and in poor condition.

---

[3] While Mr. Yamamura acknowledged that land use under county zoning laws permits various agricultural uses and is different from land use under the Dairy Lease, which is restricted to a dairy operation, he testified that he appraised the leasehold interest in the Dairy Lease assuming that only a dairy would be operated there.

Debtor also disputed Mr. Genske's $1 million valuation for the Ranch Lease based on its purported "feed" value. The Ranch Lease did not permit the leaseholder to utilize the land to grow feed for sale; its use was limited strictly to "pasture" for the leaseholder.[4] In addition, the land was still not providing sufficient grass for the existing cattle due to continuing drought conditions, causing Debtor to have to spend $475,000 postpetition in feed and shipping costs.

### 2. The evidentiary hearing and bankruptcy court's ruling

Prior to the two-day evidentiary hearing, Debtor submitted a revised hypothetical chapter 7 liquidation analysis, which still reflected that nonpriority general unsecured creditors would receive nothing in a liquidation scenario. Debtor first noted that it actually had 2,174 cattle, which was more than previously stated: 1,104 dairy cows, and 1,070 beef cows. However, Debtor estimated that their average slaughterhouse value was only $400 per animal, down from $500, because many of them were calves or weighed less than 500 lbs. Thus, Debtor's new valuation for the cattle was lower. In addition, Debtor had received another $500,000 DIP loan from Mr. Sadeghi, increasing his super-priority claim to $1 million, and administrative claims had also increased. Debtor argued that even if the court accepted Mr. Genske's liquidation valuation of Debtor's assets, including the $1.15 million

---

[4] To clarify, Mr. Genske testified that the feed/grass value alone would be worth $1 million annually to any tenant using the ranch land for pasture. He did not assume that Debtor or any other tenant would be selling the feed/grass to others. In fact, the Ranch Lease limits "the cultivation of feed crops to be used strictly within the premises."

appraisal for the Dairy Lease (but not the $1 million for the Ranch Lease), nonpriority general unsecured creditors would not receive a distribution.

In response, the Kea Creditors filed a supplemental objection, which included a revised liquidation valuation by Mr. Genske. He concluded that even with the increased super-priority and administrative claims, $544,997 would be available for nonpriority general unsecured creditors, or $1,544,997 if the Ranch Lease was included. Mr. Genske based this on the following. First, given the higher number of cattle to sell and recent market pricing of $.82/lb. to $1.19/lb. for lower grade cattle like Debtor's, the cattle were now worth $1,518,350 (up from $1.35 million), minus the $600,000 Debtor calculated for sale costs.[5] Second, Debtor was entitled to a refund of a $200,000 bond it pledged to the Department of Agriculture and a $100,000+ payment from the USDA, which Mr. Genske said were never accounted for. Finally, Mr. Genske opined that, if done correctly, there would be no capital gains tax on a cattle sale as Debtor contended. However, he did not elaborate on his theory. At the evidentiary hearing, Mr. Genske conceded that he had not inspected Debtor's cattle and did not know about their inferior genetics before opining on their value. He had, however, viewed some photos of the animals.

---

[5] Mr. Genske realized at the evidentiary hearing that he erred in thinking Debtor's $600,000 figure for cattle sale costs was for shipping them to the mainland, as opposed to what the estate would incur caring for the cattle for until they were sold on the Big Island. Consequently, Mr. Genske's cattle liquidation valuation failed to consider what the total sale costs would be for selling the cattle on the mainland. Mr. Kea testified that the cattle could be sent to the mainland by boat rather than by air, and that current shipping rates were between $.51-$.55/lb., which included water and feed.

The bankruptcy court confirmed the Plan, concluding that it satisfied the "best interest of creditors test" under § 1129(a)(7)(A)(ii) because nothing would be available for nonpriority general unsecured creditors in a chapter 7 liquidation. The court rejected Mr. Yamamura's appraisal value for the Dairy Lease and found that the dairy assets combined – the Dairy Lease, dairy herd, equipment, and buildings – were worth $700,000. This valuation was based on the price Dutch agreed to pay for those assets, and what Debtor agreed to accept, in 2020, which in the court's opinion was strong evidence of value. Given that the Dairy Lease's remaining term was shorter, that the buildings and equipment were that much older, and that the drought and inbreeding continued to devalue the dairy herd, the court said it was "nearly inconceivable" that the dairy assets had gained value since then.

The court was also not persuaded by the Kea Creditors' position that a chapter 7 trustee could accomplish a cattle sale on the mainland. Assuming an average weight of 500 lbs. each, 2,200 animals, and a freight charge of $.51/lb. for shipping them by boat to the mainland (and not including any costs getting the animals to and from the port), the court estimated that freight costs would total $561,000. In the court's experience, the shipper would require a chapter 7 trustee to pay the freight in advance. The estate's cash on hand was only about $68,000. Therefore, selling the animals on the mainland was not feasible.

As for the cattle ranch assets – the Ranch Lease and beef cattle – the court noted that the valuation evidence was "thin." Ultimately, it concluded

10

that for nonpriority general unsecured creditors to receive a return, a chapter 7 trustee would have to sell the ranch assets for at least $1.5 million, which was equal to the senior claims of $2.2 million minus the $700,000 value for the dairy assets. Based on the need to prepay the freight charge for shipping the beef cattle to the mainland, lack of prior interest in the Ranch Lease, and potential problems selling or subleasing the Ranch Lease, the court did not believe that a trustee would be able to achieve that result. But even accepting Mr. Genske's $1 million valuation for the Ranch Lease, the court concluded that nonpriority general unsecured creditors would still receive nothing.

The Kea Creditors timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(L). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Did the bankruptcy court clearly err in determining that the Plan satisfied the "best interest of creditors test" under § 1129(a)(7)(A)(ii)?

## STANDARD OF REVIEW

The bankruptcy court's determination of the "best interests of creditors" under § 1129(a)(7)(A)(ii) is a finding of fact reviewed under the clearly erroneous standard. *United States ex rel. Farmers Home Admin. v. Arnold & Baker Farms (In re Arnold & Baker Farms)*, 177 B.R. 648, 653 (9th Cir. BAP 1994), *aff'd*, 85 F.3d 1415 (9th Cir. 1996). Under that standard, if the bankruptcy court's findings are plausible in light of the record viewed in its entirety, we may not

11

reverse even if we would have weighed the evidence differently. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) (citations omitted).

## DISCUSSION

### A.    Section 1129(a)(7)(A)(ii)

To confirm a plan, § 1129(a)(7)(A)(ii) requires that the plan proponent demonstrate that each non-accepting impaired class of creditors would receive as much under the plan as they would in a chapter 7 liquidation. *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 657 (9th Cir. 1997). This section, referred to as the "best interests of creditors test," prevents confirmation of a plan if a non-accepting impaired claimant is given less value than would be received if the debtor's assets were liquidated under chapter 7.

The bankruptcy court must make specific findings to determine whether each non-accepting claimant in the impaired classes would receive at least as much under the plan as it would receive in a hypothetical chapter 7 liquidation. *Id.* "The hypothetical liquidation analysis must be based on evidence and not assumptions in order to meet the best interests of creditors test." *Schoenmann v. Bank of the W. (In re Tenderloin Health)*, 849 F.3d 1231, 1237 (9th Cir. 2017) (cleaned up). The burden was on Debtor to establish by a preponderance of the evidence that its Plan satisfied the best interests of creditors test. *In re Zaruba*, 384 B.R. 254, 262 (Bankr. D. Alaska 2008).

12

**B.    The bankruptcy court did not clearly err in determining that the Plan satisfied the best interests of creditors test.**

The Kea Creditors argue that the bankruptcy court erred by shifting the burden of proof with respect to valuation of the estate's assets to the Kea Creditors, and that it further erred by assuming facts not in evidence and resolving those disputed matters in favor of Debtor. The Kea Creditors take issue with three of the bankruptcy court's findings of fact. However, they do not demonstrate how a reversal of any of these findings, alone or even together, would result in a dividend to nonpriority general unsecured creditors.

**1.    The court did not clearly err in valuing the dairy assets at $700,000.**

The Kea Creditors argue that the bankruptcy court's valuation of the dairy assets was clearly erroneous. The court based its $700,000 valuation on the failed sale of Cloverleaf Dairy to Dutch in 2020/2021. The court was not persuaded by Mr. Yamamura's view that the Dairy Lease alone was worth $1.15 million as of March 30, 2020, much less in October 2023 at the time of the confirmation hearing. His appraisal was prepared for loan purposes, and while it acknowledged the pending sale to Dutch for $700,000, it did not explain how the Dairy Lease by itself could be worth more than the package of dairy assets that included the lease and other property. The appraisal also relied on the "income capitalization approach," which "requires the estimation of revenues and expenses from which net income is derived" and then capitalizes the stream of net income to arrive at a valuation. However, noted

the court, the appraisal contained no information about Cloverleaf Dairy's revenues and expenses. The appraisal also relied on the concept of "bonus rent," which the court found had nothing to do with the actual revenue or expenses of operating the property under the lease terms. Bonus rent could only be realized by the lessee if it could sublet the property at the estimated fair market rent. But that also presented difficulties, because Debtor could not sublease the property without the State's consent, and the State had the right to increase the rent. Finally, and what the court found to be most important, Mr. Yamamura's appraisal was based on the "market value" of the leasehold, assuming that neither the buyer nor the seller was under "undue duress." Considering this would be a liquidation situation where a trustee would be pressured to sell things quickly, the court believed that an appraisal assuming value under no undue duress was "not a good fit."

The Kea Creditors argue that several things have changed for the better since 2020 when Debtor agreed to sell Cloverleaf Dairy to Dutch for $700,000. Therefore, it follows that the court should have valued the dairy assets for far more than $700,000. For example, argue the Kea Creditors, the future of Meadow Gold, the only milk processor in Hawaii, is no longer uncertain like it was in January 2020. Mr. Sadeghi has since purchased the company and is paying Cloverleaf Dairy more for its milk. Further, in 2017, prior to the uncertainty about Meadow Gold, Cloverleaf Dairy was under contract to another buyer for $2 million. Finally, while the drought in 2019 was the worst Debtor had ever experienced, drought conditions have improved.

14

While the Kea Creditors raise some salient points, we cannot say that the bankruptcy court's valuation of the dairy assets for $700,000 was implausible. As for the uncertainty of Meadow Gold, even though Debtor and Dutch initially contracted to sell Cloverleaf Dairy in January 2020, the closing date was pushed to July 24, 2021. By that time, Meadow Gold's future was not so uncertain yet the sale to Dutch was still set to go forward for $700,000. Further, the 2017 sale contract for $2 million did not close, and neither did the sale to that buyer for the reduced price of $1 million, so those figures are not particularly helpful or supportive to the Kea Creditors' argument. Finally, the Kea Creditors overlook that for the first six months of the case Debtor was continuing to operate at a significant loss despite cash infusions from Mr. Sadeghi and a government grant.

**2.  The court erred in its assumption about the freight charge.**

Next, the Kea Creditors argue that the bankruptcy court erred in finding that a chapter 7 trustee would be required to prepay the freight to ship the cattle to the mainland, thereby making any sale infeasible. They argue that no evidence supported this finding or established that no mainland buyer would take delivery of the animals in Hawaii or advance the freight costs before delivery, and that the lack of evidence should have cut against Debtor. Mr. Boteilho testified that Debtor's cattle are usually purchased by buyers in Hawaii who then ship them to the mainland, and the Kea Creditors argue that the court should have considered this in its analysis.

15

We agree that there was no evidence on this issue one way or the other and that the court should not have made these assumptions. *In re Tenderloin Health*, 849 F.3d at 1237. However, while Mr. Boteilho testified that Debtor generally sells most of its beef cattle to other ranchers in Hawaii, both parties only determined a slaughterhouse value for the cattle. No value was provided for a straight sale of these cattle to buyers in Hawaii. So, the court had nothing to consider in that respect.

In any event, even though the court erred in assuming without evidence that the freight for shipping cattle to the mainland would have to be paid upfront by the estate, the Kea Creditors have not shown how this makes any difference to the outcome.

3. **The court did not clearly err in ultimately finding that nonpriority general unsecured creditors would receive nothing in a liquidation.**

Lastly, the Kea Creditors argue that the bankruptcy court erred in finding that the Ranch Lease had no value. The court did not find that the Ranch Lease was valueless. Rather, it found that for nonpriority general unsecured creditors to receive a distribution, the ranch assets – i.e., the Ranch Lease, beef cattle, and related equipment – would have to sell for more than $1.5 million. The court did not believe that a chapter 7 trustee could realize that amount for various reasons. Further, the court found that even if Mr. Genske's $1 million valuation for the Ranch Lease was correct, nonpriority general unsecured creditors would still receive nothing.

16

The Kea Creditors fail to address any errors by the bankruptcy court regarding its findings as to the ranch assets, or how any error the court made here would make a difference to the outcome. They do not even "do the math" to show what they and other nonpriority general unsecured creditors might receive if we found in their favor. This, in itself, is reason enough to affirm.

But even if we review the court's findings and evidence presented at trial with respect to the ranch assets, we cannot say that its determination that the best interests of creditors' test was satisfied in this case was clearly erroneous.

First, as the chart below shows, the court determined that senior debts – including secured claims and administrative expenses – were just over $2.2 million.[6] Turning to the assets available for distribution in a hypothetical chapter 7 case, Debtor had approximately $68,000 in cash. It estimated the value of its Equipment & Vehicles at $105,000. These amounts are not in dispute. And, the court determined that the value of the dairy assets was $700,000, which finding we conclude was not clearly erroneous. That leaves the ranch assets, which included 1,070 head of beef cattle and the Ranch Lease. Both parties presented evidence of a sale price for the beef cattle. The court did not make a determination of the sale price for the beef cattle, because it concluded that, collectively, the ranch assets would not produce sufficient value at liquidation to provide a recovery for unsecured creditors. This result

---

[6] The Kea Creditors do not challenge the bankruptcy court's findings as to the amount of the senior debt that would have to be paid before nonpriority general unsecured creditors would receive a distribution in a chapter 7 case.

would not change even if we were to apply the Kea Creditors' cattle valuation methodology to the beef cattle. The Kea Creditors posited an average weight of 545 lbs. per animal. With their proposed sale price of $1.00/lb. and a freight charge of $.51/lb., the beef cattle would have a value of $285,743.50.

| ASSETS | AMOUNT |
|---|---|
| Cash on Hand | $ 68,000.00 |
| Dairy Assets | $ 700,000.00 |
| Equipment & Vehicles | $ 105,000.00 |
| Beef Cattle (1,070 head, 545 lb. avg., $1.00/lb. sale price and $0.51/lb. transport cost) | $ 285,743.50 (proceeds from sale on mainland) |
| TOTAL ASSETS | $1,158,743.50 |
| | |
| LIABILITIES | |
| Secured/Priority Claims: | |
| Hawi Dairy Acquisition | $ 206,939.84 |
| Logix Capital | $ 200,000.00 |
| DIP Loans | $ 1,000,000.00 |
| | |
| Administrative Claims: | |
| Ch. 7 Trustee Fee | $ 113,458.20 |
| Ch. 7 Trustee's Professionals | $ 50,000.00 |
| Adversary Proceeding | $ 25,000.00 |
| Ch. 11 Professionals | $ 325,000.00 |
| Capital Gains Tax on Cattle Sale | $ 270,000.00 |
| Priority Tax Claims | $ 2,500.00 |
| Priority Employee Claims | $ 7,575.00 |

| TOTAL LIABILITIES | $ 2,200,473.04 |
| --- | --- |
| | |
| EQUITY | $-1,041,729.54 |

Prior to considering the Ranch Lease, there is negative equity of $1,041,729.54. The bankruptcy court assumed that the Ranch Lease had a value of $1 million. For unsecured creditors to receive any recovery, even using the Kea Creditors' figures for valuing the beef cattle, the Ranch Lease would have to be worth more than even the $1 million asserted by the Kea Creditors. And in fact, the bankruptcy court found that a chapter 7 trustee would probably not realize that value for a host of undisputed reasons.

Furthermore, the court's hypothetical liquidation analysis did not include additional costs which likely would reduce the funds available for unsecured creditors, such as the costs to care for the animals while waiting for shipment. Debtor maintained such costs would have been $150,000 per month for all of the cattle, which the Kea Creditors did not dispute. As the beef cattle make up approximately half of Debtor's herd, the cost for their care would be about $75,000 monthly. Even if it only took one month to coordinate shipment to the mainland, which may be an optimistic estimate, the cost to care for the beef cattle would eliminate any possible chance of a distribution to unsecured creditors.

The Kea Creditors have not shown that it was clearly erroneous for the bankruptcy court to find that a chapter 7 trustee could not generate any return for nonpriority general unsecured creditors in a hypothetical chapter 7

19

liquidation. Accordingly, the court did not clearly err in finding that Debtor's Plan was in the best interests of creditors under § 1129(a)(7)(A)(ii).

## CONCLUSION

For the reasons stated, we AFFIRM.